## ATTACHMENT A
### Statement of Facts

*The United States and Defendant Thomas Hardin Firth stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. They further stipulate and agree that these are not all of the facts that the United States would prove if this case proceeded to trial.*

The Defendant, **THOMAS HARDIN FIRTH ("FIRTH")**, was a resident of Virginia and the vice president of Kavasko Corporation. Kavasko Corporation, also known as Adige Inc., Kavasko Corp., Kavasko LLC, KC Financial Services Corporation, KC Financial Services and Trust Corp, KC Auto Gallery, KCK Auto Brokerage, and KC Marketing Services, LLC (collectively referred to as "Kavasko") was a corporation registered in Virginia that served as a luxury vehicle broker and operated in the Fairfax County, Virginia area. **Kerem Celem ("Celem")** was the owner, president, and director of Kavasko.

From in or about March 2013 through in or about November 2014, in the District of Maryland and elsewhere, the Defendant, **Thomas Firth ("FIRTH")**, knowingly and willfully conspired with **Celem, Michael John Stoll ("Stoll"), Brian Albert Armstrong ("Armstrong"), Dimitrios Balourdos ("Balourdos")**, Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, and other persons known and unknown to the Grand Jury, to execute and attempt to execute a scheme and artifice to defraud financial institutions and to obtain monies, funds, credits, assets, and securities owned by and under the custody and control of financial institutions, by means of materially false and fraudulent pretenses, representations and promises (the "scheme to defraud"), in violation of Title 18, United States Code, Section 1344.

As part of the conspiracy and scheme to defraud, straw buyers were recruited by other Kavasco employees at job fairs and home improvement shows. **FIRTH, Stoll**, and others arranged for the straw buyers to purchase luxury vehicles with fraudulently obtained loans from various financial institutions from a number of different car dealerships in Maryland. **FIRTH, Celem, Stoll**, and **Armstrong** instructed the straw buyers to falsely state on the loan applications that they were the true purchasers of the vehicles. Prior to purchasing the vehicles, the straw buyers were required to sign "Non Exclusive Purchasing Agency Agreements" with Kavasko that designated the straw buyers as purchasing agents for Kavasko. In contradiction to the Retail Sales agreements signed by the straw buyers at the time they purchased the vehicle, the straw buyers were required to transfer title of the vehicle and the vehicle immediately upon completion of the purchase.

As a further part of the conspiracy and scheme to defraud, **FIRTH, Celem**, and others sold the luxury vehicles purchased by the straw buyers to various companies, knowing that the vehicles would be exported outside the United States—again, in contradiction to the Retail Installment Sale Contracts signed by the straw buyers.

As a further part of the conspiracy and scheme to defraud, **FIRTH, Celem, Stoll**, and others eventually stopped making payments on the vehicle loans obtained by the straw buyers, and the cessation in payments caused the loans to go into default.

8

~~FIRTH~~ nine was instrumental in causing more than $3,500,000 but not more than $9,500,000 in losses to at least ~~ten~~ financial institution victims through the scheme referenced above.

In June 2014, Co-Conspirator 4 agreed to buy two luxury vehicles on behalf of Kavasko. Co-Conspirator 4 completed an application with Kavasko that stated Co-Conspirator 4 was retired with an annual income of $45,000. Co-Conspirator 4 met with **FIRTH** and another co-conspirator, and **FIRTH** advised Co-Conspirator 4 that he (**FIRTH**) did not believe Co-Conspirator 4 made enough money to qualify for a loan to purchase the vehicles. As a result, **FIRTH** advised Co-Conspirator 4 that Kavasko was going to employ Co-Conspirator 4 for a day to increase his annual salary. **FIRTH** went into the other room, filled out and signed a document, and gave the document to Co-Conspirator 4 as proof that Co-Conspirator 4 worked for Florida Gateway, a company owned by **Celem**. The document was to provide the basis for the income that Co-Conspirator 4 was going to list on his credit application. **FIRTH** explained that Co-Conspirator 4 needed to lie on his credit application because there was no way Co-Conspirator 4 would be approved for a loan with his actual income.

Co-Conspirator 4 then went to buy a luxury vehicle at an automobile dealership in Maryland (Dealership A), but that Dealership A did not have one available, and so Co-Conspirator 4 left Dealership A without signing a credit application or loan agreement. Co-Conspirator 4 was told by another coconspirator that when the luxury vehicle was available for purchase, Co-Conspirator 4 was to return to Dealership A, sign the credit application or loan agreement, and then transfer the vehicle to Kavasko. That never occurred. Instead, Co-Conspirator 4 later learned that luxury vehicle had been sold– even though Co-Conspirator 4 had not, in fact, signed a credit application or loan agreement. The credit application in the name of Co-Conspirator 4 that was submitted to SunTrust Bank for the purchase of the luxury vehicle at Dealership A falsely lists his occupation as the Director of Sales with "Florida Gateway Regional," with an annual income of $156,500—a false statement that was caused to be made by **FIRTH**.

\* \* \*

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

8/31/17
Date

Thomas Hardin Firth

I am Thomas Hardin Firth's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

8/31/2017
Date

J. Dennis Murphy, Jr., Esq.